# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 16-cr-287 (PAM/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Quentin Lamont Lavell Perry, | |
| Defendant. | |

Surya Saxena, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Andrew S. Garvis, Koch & Garvis, Lake Calhoun Professional Building, 3109 Hennepin Avenue South, Minneapolis, MN 55408 (for Defendant).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Quentin Lamont Lavell Perry's Pretrial Motion to Suppress Search and Seizure (ECF No. 24), Pretrial Motion to Suppress Eyewitness Identifications (ECF No. 27), and Motion to Suppress Evidence Obtained as a Result of Search and Seizures (ECF No. 35). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Paul A. Magnuson, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on January 26, 2017. Representing the United States of America (the "Government") was Assistant United States Attorney Michael Cheever,

who appeared on behalf of Assistant United States Attorney Surya Saxena. Andrew S. Garvis appeared on behalf of Defendant Quentin Lamont Lavell Perry.

The Court heard testimony from Officers Jeff Korus and Peter Baldwin with the City of St. Paul Police Department. The Government offered and the Court received: Exhibit 2, an application for search warrant and supporting affidavit, search warrant, and receipt, inventory, and return for a Chrysler 300 automobile; Exhibit 3, an aerial map of the area in which the events at issue took place; Exhibit 4, a DVD containing video from the squad car of Officers Korus and Baldwin; Exhibit 6, the supplemental offense/incident report of Officer Korus; Exhibit 7, the supplemental offense/incident report of Officer Baldwin; Exhibit 9,[1] a DVD containing video from the squad car of "Officer Everett,"[2] also with the City of St. Paul Police Department; and Exhibit 10, a side-profile photograph of Defendant along with his white shoes with straps on the night in question. The Government also offered and the Court received Exhibit 11, the supplemental offense/incident report of Officer Chad Hanson with the City of St. Paul Police Department, for the limited purpose of refreshing Officer Korus's recollection.[3] (Tr. 63.) Defendant offered and the Court received: Exhibit 1, a front-profile photograph of Defendant on the night in question. Post-hearing briefing is now complete and these motions are ripe for a determination by the Court.

---

[1] Exhibit 9 was received without objection and the parties agreed that the Government would provide a copy after the hearing. (Tr. 31, 89-91.) Following the hearing, the Government delivered a copy of Exhibit 9 to chambers.
[2] Officer Everett's first name is not in the record.
[3] This report has not been relied upon by the Court.

# I. FINDINGS

Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

Officer Korus has been a police officer with the City of St. Paul for approximately six years. (Tr. 9.) Officer Baldwin has been a police officer for approximately eleven years and has worked roughly the last five of those years for the City of St. Paul. (Tr. 67.) Officers Korus and Baldwin are partners. (Tr. 10, 67.)

On August 6, 2016, Officers Korus and Baldwin were working the overnight shift into August 7, 2016. (Tr. 9-10, 68.) Around 1:00 a.m. on August 7, the officers received a call of shots fired around Isabel Street near a bar in St. Paul, Minnesota. (Tr. 10, 13-14, 37; Gov't Ex. 7 at 1-2; *see* Gov't Ex. 6 at 4.) The officers activated their squad lights and proceeded to the scene. (Tr. 11.) At this point, their squad video began recording. (Tr. 11; *see* Gov't Ex. 4.) As the officers were driving, they received a description of the suspect: a taller, black male with a goatee wearing a white shirt and dark pants. (Tr. 14; Gov't Ex. 4 at 1:18:31-35; Gov't Ex. 6 at 4.) Shortly after hearing the description, they saw two silhouettes walking across Robert Street. (Tr. 14, 38, 52; Gov't Ex. 6 at 4; *see* Tr. 50, 70; Gov't Ex. 7 at 2.) Aided by streetlights, Officer Korus noticed that one of the individuals was a taller, dark-complexioned black male wearing a white shirt, dark pants, and white shoes as the squad car got closer. (Tr. 15; Gov't Ex. 6 at 4; *see* Gov't Ex. 7 at 2.) Closer yet, Officer Korus noticed that the man also had a goatee. (Tr. 15; Gov't Ex. 6 at 5.) The second man was a shorter, light-complexioned black male with a larger build, wearing a light-colored tank top. (Tr. 15, 59, 60, 63; *see* Gov't Ex. 6 at 4.) Officer Korus

briefly made eye contact with the two men and the two men split up. (Tr. 15, 38; *see* Gov't Ex. 6 at 4-5.)

The man with the goatee, wearing the white shirt and dark pants, walked a short distance down Robert Street, passed between some buildings, and went into a parking lot. (Tr. 16, 17, 39; Gov't Ex. 6 at 5.) Officers Korus and Baldwin proceeded on to Cesar Chavez Street, and then turned into the parking lot. (Tr. 16-17, 70; Gov't Ex. 7 at 2; *see* Gov't Ex. 4 at 01:19:05-1:20:14.) Once in the parking lot, they observed the man with the goatee, white shirt, and dark pants (subsequently identified as Defendant) standing next to a red Chrysler 300 automobile. (Tr. 17, 39, 40, 70, 77; Gov't Ex. 6 at 5; Gov't Ex. 7 at 2; *see* Tr. 52.) Approximately eight to ten minutes had passed since the officers received the call regarding shots fired. (Tr. 39; *see* Gov't Ex. 4 at 1:12:53-1:20:10.)

The area was well lit. (Tr. 40; Gov't Ex. 6 at 5.) The red car was the only car in the vicinity. (Tr. 18.) Defendant was standing next to the car on the passenger side, almost as if he was leaning against it. (Tr. 18-19; Gov't Ex. 6 at 5; *see* Gov't Ex. 7 at 2.) The front of Defendant's shirt was dark colored, but the sleeves and back of the shirt were white. (Tr. 35, 53; Def. Ex. 1; Gov't Ex. 10.) From the back, Defendant's shirt appeared to be all white. (Tr. 35; Gov't Ex. 7 at 2; *see* Gov't Ex. 10.) The officers exited their squad car. (Tr. 19.) Officer Baldwin approached Defendant and Officer Korus began to check the area. (Tr. 19; Gov't Ex. 6 at 5; Gov't Ex. 7 at 2; *see* Gov't Ex. 4 at 1:20:24-40.)

Officer Baldwin asked Defendant to place his hands on his head and interlock his fingers. (Tr. 41, 71, 81; Gov't Ex. 4 at 1:20:53-55: Gov't Ex. 7 at 2.) Defendant

complied. (Tr. 41-42, 77; Gov't Ex. 7 at 2.) Around this time, the officers received additional information that the suspect had been wearing white tennis shoes with straps instead of laces. (Tr. 24, 38, 73.) Defendant was wearing white tennis shoes with Velcro straps in lieu of laces. (Tr. 24, 54, 73, 74.) Officer Baldwin testified that Defendant matched the description of the suspect involved in the shots-fired call. (Tr. 73-74.)

While Officer Baldwin was speaking with Defendant, Officer Korus checked the area near the tires and under the car "for any discarded evidence." (Tr. 20; *see* Tr. 42, 71, 86; Gov't Ex. 6 at 5.) Officer Korus then shone his flashlight into the car's windows. (Tr. 20-21.) While looking through the windshield, he observed two black handgun magazines partially exposed under the passenger seat. (Tr. 20; Gov't Ex. 6 at 5; *see* Tr. 21, 43.) Nearby, he also saw a partially exposed black and silver semiautomatic handgun. (Tr. 20; Gov't Ex. 6 at 5; *see* Tr. 21, 43.) Officer Korus signaled to Officer Baldwin to place Defendant in handcuffs, and shortly thereafter communicated to Officer Baldwin what he had found. (Tr. 20-21, 71, 82; Gov't Ex. 7 at 2; *see* Gov't Ex. 6 at 5.) Approximately one minute had passed since the officers first approached Defendant. (*See* Gov't Ex. 4 at 1:20:33-1:21:25.) Defendant was told that he was being detained. (Gov't Ex. 4 at 1:21:28; Gov't Ex. 7 at 2.)

Once Defendant was in handcuffs, Officer Baldwin performed a pat search around his waistband, legs, upper body, and pockets. (Tr. 23, 44, 73, 79, 80; *see* Gov't Ex. 4 at 1:21:37-1:23:35.) Defendant had "bulging pockets" containing several items, including keys, a wallet, and wadded-up money. (Tr. 79; Gov't Ex. 7 at 2; *see* Gov't Ex. 4 at 1:23:20-21.) Officer Baldwin "felt what [he] thought was a bullet through [Defendant's]

5

left front pocket," but did not remove anything from Defendant's pockets at this time. (Tr. 73; *accord* Gov't Ex. 7 at 2; *see* Tr. 83.)  Defendant was then placed under arrest. (Gov't Ex. 4 at 1:23:35-39.)  It was ultimately determined that the car belonged to Defendant's uncle, the other male walking with Defendant.  (Tr. 58; *see* Tr. 22-23, 83; Gov't Ex. 4 at 1:22:24, 1:31:31, 1:39:34; Gov't Ex. 7 at 2.)  The car was towed and a search warrant was later obtained.  (Tr. 22, 72; *see* Gov't Ex. 2.)

Officer Korus obtained the contact information for A.I., the person who had called 911, to see if she[4] had any further information.[5]  (Tr. 25; Gov't Ex. 6 at 6.)  A.I. reiterated her description of the man she saw fire shots into the air from a handgun after leaving the bar: a taller (possibly 5'8" or 5'9"), dark-complexioned, black male with a goatee, wearing a white shirt, dark pants,[6] and white shoes with straps rather than laces.  (Tr. 26, 31, 38, 57; Gov't Ex. 6 at 5; *see* Gov't Ex. 4 at 1:25:47-1:26:00; Gov't Ex. 6 at 6.)  A.I. told Officer Korus that she could identify the man that she saw.  (Tr. 26; Gov't Ex. 6 at 6.)  Another police officer, Officer Everett, was sent to pick up A.I. and bring her back to the parking lot.  (Tr. 26, 27; Gov't Ex. 6 at 6.)

Officer Baldwin led Defendant over to the squad car.  (Tr. 84; Gov't Ex. 4 at 1:24:54-1:25:05; Gov't Ex. 7 at 2.)  Officer Baldwin then searched Defendant,

---

[4] The Court notes that A.I. was identified as female at the hearing.  (Tr. 25.)

[5] There was another person with A.I. at the time of the events in question, J.H.  The Government has "agree[d] not to ask J.H. to make an in-Court identification at trial, and to limit testimony regarding J.H.'s participation in the on-the-scene identification during the [G]overnment's case-in-chief."  (Gov't's Supp. Resp. at 13, ECF No. 43.)  The Government notes, however, that if "Defendant elicits testimony about J.H.'s prior identification, that may open the door to a detailed discussion of her identification at trial."  (Gov't's Supp. Resp. at 13.)  Given the Government's position, the Court has neither relied on any information purportedly provided by J.H. nor discussed her involvement.

[6] The Court credits Officer Korus's testimony at the hearing that, during this follow-up call, A.I. told him that the suspect was wearing dark pants, not "dark shorts" as stated in Officer Korus's report.  (Gov't Ex. 6 at 6.)  A.I. was adamant that the man she saw was wearing pants, not shorts.  (*See* Gov't Ex. 9 at 2:16, 2:17, 2:22.)

discovering, among other things, three rounds of live ammunition in Defendant's pants pockets. (Tr. 24, 74-75, 85; Gov't Ex. 4 at 1:32:57-1:36:50; Gov't Ex. 7 at 2-3.) Officer Korus was present when Officer Baldwin retrieved the live ammunition from the pockets of Defendant's pants. (Tr. 25; *see* Gov't Ex. 4 at 1:34:13, 1:35:30, 1:35:36-38.) Defendant was then seated in the squad car of Officers Korus and Baldwin. (Gov't Ex. 4 at 1:39:45-55; Gov't Ex. 7 at 3.) Defendant's shoes with "three straps" were removed. (Gov't Ex. 4 at 1:39:53-1:40:36.)

Around 2:15 a.m., Officer Everett brought A.I. to the parking lot where Defendant was being held.[7] (*See* Tr. 27, 46; Gov't Ex. 9 at 2:15:00.) Video from Officer Everett's squad car shows A.I.'s arrival on the scene. (Gov't Ex. 9; *see* Tr. 29-31.) On the way, A.I. stated that she was intoxicated at the time of the shooting. (Gov't Ex. 9 at 2:11:10-11.) A.I. stated that the shooter looked her straight in the eye. (Gov't Ex. 9 at 2:11:30-31.) A.I. also stated that she had "never been so scared in [her] life." (Gov't Ex. 9 at 2:25:50-51.) When A.I. arrived, the officers explained to her that they would be taking Defendant out of the squad car for the identification. (Gov't Ex. 9 at 2:15:55, 2:16:46-51.)

A.I. was sitting in the backseat of Officer Everett's squad car when Defendant was presented for identification. (Tr. 32.) There was approximately 25 feet between Officer Everett's squad car and Defendant. (Tr. 51.) The spotlight from Officer Everett's squad car was used to illuminate Defendant, who was standing next to the squad car of Officers Korus and Baldwin. (Tr. 31.) Defendant was handcuffed. (Tr. 51.) A.I. identified

---

[7] *See supra* n.5.

Defendant from inside the squad car. (*See* Tr. 51-52.) When she saw Defendant, A.I. stated, "Yup. That's him. That's him. That's him. That's him. Na—navy—navy blue and white shirt." (Gov't Ex. 9 at 2:16:53-57.) A.I. also stated, "That's him. I told you he had jeans on." (Gov't Ex. 9 at 2:16:58-59.) A.I. additionally stated that she "knew [the shooter] didn't have shorts on." (Gov't Ex. 9 at 2:17:16-17; *see also* Gov't Ex. 9 at 2:17:18-19, 28-29, 2:22:14.) A.I. was positive that Defendant was the shooter. (Tr. 34; *see* Gov't Ex. 9 at 2:17:23-27, 35-36, 45, 2:22:09-10, 24, 45.) A.I. also commented on Defendant's white shoes in the hands of an officer. (Gov't Ex. 9 at 2:17:29-30.)

At the hearing, Officer Korus testified that he was six feet two inches tall and Defendant was approximately the same height. (Tr. 47.) Officer Korus also acknowledged that Defendant was not wearing an all-white shirt. (Tr. 48.)

## II. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law. Defendant contends that the officers unlawfully expanded the scope of the pat-down search and arrested him without probable cause; the show-up identification was constitutionally suspect; and there was no probable cause to believe that Defendant had placed anything inside the red car. Defendant seeks to suppress the evidence obtained from the searches of his person[8] and the car as well as the show-up identification.

---

[8] At the hearing, Defendant withdrew the challenge to the DNA buccal swab, leaving only the ammunition recovered from his pockets at issue. (Tr. 6.)

### A. Arrest of Defendant

"The Fourth Amendment protects '[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008) (quoting U.S. Const. amend IV) (alteration in original). "A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). "Probable cause sufficient to make a warrantless arrest exists when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Jones*, 535 F.3d at 890 (quotation omitted); *see also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.") (quotation omitted).

"Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Winarske*, 715 F.3d at 1067. A probability or substantial showing of criminal activity is sufficient. *Jones*, 535 F.3d at 890; *accord Winarske*, 715 F.3d at 1067. Further, law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances when making probable-cause determinations. *Winarske*, 715 F.3d at 1067; *accord United*

*States v. Chappell*, 779 F.3d 872, 878 (8th Cir. 2015) ("Recognizing the police possess specialized law enforcement experience and thus may draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous, we afford the police substantial latitude in interpreting and drawing inferences from factual circumstances.") (quotations and citations omitted).

Here, a description of the shooter's physical appearance and attire was given to law enforcement. The description included the shooter's race, facial hair, estimated height, and clothing: a taller, black male with a goatee wearing a shirt and dark pants. Officers Korus and Baldwin arrived on the scene within minutes of receiving the call that shots had been fired. When the officers were within approximately one block of where the shots had been reported, they observed two black males—one of whom was taller, had a goatee, and was wearing a white shirt, dark pants, and white shoes—crossing the street. After making eye contact with Officer Korus, the men split up. The officers caught up with the man matching the description of the shooter, Defendant, in a nearby parking lot after he passed between some buildings. Around this time, the officers received additional information that the shooter was wearing white tennis shoes with straps instead of laces. The white shoes Defendant was wearing also had straps instead of laces.

Defendant argues that he "was not the right height, he did not have the right facial hair, his shirt was not the same as witnesses had described and he was not found in the same area the shooter was seen walking after the incident." (Def.'s Mem. in Supp. at 13, ECF No. 42.) Defendant is correct that he was not a perfect match to the description of

the shooter: Defendant is several inches taller; his shirt was both white and navy; and the characterization of facial hair can be debated (a short beard versus a goatee). While there are some inconsistencies, Defendant matched the material aspects of the shooter's description. Defendant is a taller, black male with facial hair that is groomed more closely on the sides of his face and longer in front. Despite his shirt being both white and navy, Defendant's shirt appeared to be all white from behind, and he was wearing dark pants. Defendant's shoes also matched the description of the shooter's shoes, both in color and the presence of Velcro straps instead of laces. Moreover, Defendant was found approximately one block away from where the shots were purportedly fired within minutes of the report.

Defendant's considerable similarity to the description of the shooter, his presence in the vicinity of where the shots were fired, and the closeness in time of these events to the report of shots fired are sufficient to lead a reasonable person to believe that Defendant was the man who fired the shots near the bar. Even before Officer Korus spotted the magazines and handgun in the red car that Defendant was standing next to, there was probable cause to arrest Defendant. Defendant's presence in an area close to where the magazines and handgun were discovered further strengthened the factual circumstances establishing probable cause to believe that Defendant was involved in the unlawful discharge of a firearm.

While the detention and subsequent arrest of Defendant were rather fluid, the officers had probable cause to arrest Defendant at the time they approached him in the parking lot. "[I]f an officer has probable cause, any inquiry into other acceptable

11

justifications for the seizure is largely superfluous." *United States v. Pratt*, 355 F.3d 1119, 1122 (8th Cir. 2004.)  And, "when police act upon probable cause to arrest, the term 'seizure' is synonymous with the term 'arrest' under the Fourth Amendment" and for purposes of the subsequent search. *Id.* at 1122-24; *see United States v. Wright*, 844 F.3d 759, 763 (8th Cir. 2016).  This is true even if the search of the defendant's person "preceded the formal arrest." *Wright*, 844 F.3d at 763 (search of defendant's person for key before formal arrest did not render search unlawful as officers had probable cause to arrest defendant before the key was seized).  Because the arrest of Defendant was supported by probable cause and therefore lawful, the search of his person following the arrest was also lawful. *Pratt*, 355 F.3d at 1124 ("The search of an arrestee's person has long been upheld as reasonable under the Fourth Amendment . . . ."); *accord United States v. Chartier*, 772 F.3d 539, 545 (8th Cir. 2014) (identifying search incident to lawful arrest as an exception to warrant requirement).  Based on the foregoing, the Court recommends that Defendant's motion to suppress the ammunition be denied.

### B. Show-Up Identification

Defendant next argues that the show-up identification was impermissibly suggestive and A.I.'s[9] identification was unreliable.  A show-up identification of the defendant "is admissible unless it is based upon a pretrial confrontation between the witness and the suspect that is both impermissibly suggestive *and* unreliable." *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998) (quotation omitted).  Thus, "[e]ven a suggestive out-of-court identification may be admissible if reliable." *United States v.*

---

[9] *See supra* n.5.

*Pickar*, 616 F.3d 821, 827 (8th Cir. 2010) (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

### 1. Suggestiveness

Defendant argues that the show-up identification was unduly suggestive because he was presented for identification having just been removed from a marked squad car while wearing handcuffs, surrounded by police officers, and with a spotlight focused on him. Defendant also argues that he was the only black male in custody and thus it was clear he was "the one police suspected of committing the crime." (Def.'s Mem. in Supp. at 14.)

"Absent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." *King*, 148 F.3d at 970 (quotation omitted); *accord Pickar*, 616 F.3d at 827-28. "Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary." *King*, 148 F.3d at 970. "Necessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." *Id.*

In *Pickar*, the Eighth Circuit Court of Appeals determined that a show-up identification was not unduly suggestive where the defendant was presented for identification in handcuffs, standing in front of a marked police car between a uniformed officer and an officer in plainclothes, and with one of the officers shining a small flashlight in his face. 616 F.3d at 829. The Eighth Circuit distinguished this show-up identification from the show-up identification

in *Clark v. Caspari*, 274 F.3d 507, 509 (8th Cir. 2001), where two African-American defendants were handcuffed and "forced to lie face down" on a driveway while an "officer with a shotgun stood over them." The defendants were "surrounded by white male police officers," and the witnesses saw one of the defendants "being hauled to his feet" by an officer. *Id.* In that case, we held the procedures used for the show-up identification "were improperly suggestive" and "increased the possibility of misidentification." *Id.* at 511.

*Pickar*, 616 F.3d at 828. The Eighth Circuit concluded that "Pickar's show-up identification was materially less suggestive than in *Clark*." *Id.*

Like *Pickar*, Defendant's show-up identification was materially less suggestive than *Clark*. The show-up identification procedure used for Defendant was almost identical to the one in *Pickar*, except that the officers were all in uniform and Defendant was illuminated with a spotlight. Notably, the identification in *Pickar* occurred on a "bright, clear day," and the flashlight was used both to illuminate the defendant's face and prevent him from seeing the witnesses inside the bank. 616 F.3d at 824. Here, the identification occurred in the middle of the night, around 2:15 a.m. The use of the spotlight was no more suggestive than the flashlight in *Pickar* and provided needed illumination given the lack of daylight. Accordingly, the Court finds that the show-up identification procedure was not unduly suggestive. *See Pickar*, 616 F.3d at 828; *United States v. Martinez*, 462 F.3d 903, 911 (8th Cir. 2006) (handcuffs, arrival at scene of crime in a police car, and presence of police officers did not render identification procedure impermissibly suggestive); *United States v. Pate*, No. 12-cr-113 (ADM/FLN), 2012 WL 3156804, at *6 (D. Minn. July 19, 2012) (show-up identification was not unduly suggestive where handcuffed defendant was taken out of a police cruiser, lead to middle

of street, and turned around a few times so witness could see him), *adopting report and recommendation*, 2012 WL 3156090 (D. Minn. Aug. 3, 2012).

### 2. Reliability

"An identification is unreliable if its circumstances create a very substantial likelihood of irreparable misidentification." *King*, 148 F.3d at 970 (quotation omitted).

> When determining whether an identification is reliable, the court must consider the factors set out in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), including: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation.

*Pate*, 2012 WL 3156804, at \*5; *see United States v. House*, 823 F.3d 482, 488 (8th Cir. 2016) (listing factors); *Pickar*, 616 F.3d at 827-28; *Jones*, 535 F.3d at 891-92.

With respect to the reliability of A.I.'s identification, Defendant argues that the identification is not reliable because it is not clear how much time A.I. had to view the shooter, particularly since she was trying to remove herself from the area, and what the lighting conditions were. Defendant also argues that A.I. was intoxicated at the time and there were differences between A.I.'s description of the shooter and Defendant. Lastly, Defendant argues that show-up identification was not prompt, occurring one hour after the shots were fired, and A.I. was allowed to confer with J.H. about what happened during the ride to the parking lot.

Under the totality of the circumstances, the Court finds that A.I.'s identification was sufficiently reliable. A.I.'s description of the shooter was a close match to

Defendant. As stated above, while there were some differences in Defendant's actual height, debate about the type of beard he had, and the precise color blocking of his shirt, A.I.'s description of the shooter materially matched Defendant. A.I. was also certain at the time of the show-up identification that Defendant was the shooter. A.I. was confident in her identification even though the officers had removed Defendant's distinctive shoes prior to the show-up. While Defendant suggests that A.I. and J.H. conferred on the identity of the shooter, the record reflects that it was only J.H. who was hesitant and questioned what the shooter had been wearing. A.I. remained confident in her identification notwithstanding the uncertainty of J.H. Moreover, the show-up occurred close in time and place to when and where the shots had been fired. *King*, 148 F.3d at 970 (show-up occurred one hour after robbery); *see Jones*, 535 F.3d at 892 (show-up occurred "less than an hour after the crime").

Defendant is correct that there is not much detail in the record regarding A.I.'s opportunity to view the shooter. But, the record does reflect that A.I. was close enough that the shooter was able to look her in the eye and for her to feel scared and threatened by his conduct. As for A.I.'s degree of attention, A.I. acknowledges on the ride back for the show-up that she was intoxicated at the time the shots were fired. Yet, at the same time, this was a traumatic, impressionable moment for A.I.—she had "never been so scared in [her] life." (Gov't Ex. 9 at 2:24:50-51.) What effect, if any, A.I.'s intoxication had on the certainty of her identification is a matter for cross-examination at trial and the jury's assessment of her credibility. *See United States v. Nelson*, 337 F. App'x 709, 710 (9th Cir. 2009) (mem.) ("Although the victim was intoxicated, the jury could have

16

reasonably believed that the victim could identify Nelson as his attacker, so this evidence was properly before the jury.") (quotation omitted); *United States ex rel. Gonzales v. Page*, No. 98 C 2554, 1999 WL 300275, at \*5 (N.D. Ill. May 6, 1999) (witness's intoxication at time of crime reflected "upon his credibility as a witness, a matter for the finder of fact").

Because the show-up identification procedure was neither impermissibly suggestive nor unreliable, the Court recommends that Defendant's motion to suppress A.I.'s identification be denied.

## C. Search of the Red Car

Lastly, Defendant argues that the handgun officers found in the red car must be suppressed because the officers "did not have probable cause to believe [he] could have placed anything inside the car in the few seconds he was out of their sight." (Def.'s Mem. in Supp. at 20.) The Government responds that Defendant lacks standing to challenge the search of the car. (Gov't's Mem. in Supp. at 13, ECF No. 43.)

As stated above, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (citing *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)); *accord United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017). "An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable [.]'" *Barragan*, 379 F.3d at 529 (quoting

17

*Minnesota v. Carter*, 525 U.S. 83, 88 (1998)) (alteration in original); *accord Wright*, 844 F.3d at 762. "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (citing *Rakas*, 439 U.S. at 130-31 n.1).

> Factors relevant to the Court's determination of standing include:
>
>> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.* (citation omitted). "The United States Supreme Court has explicitly determined that a person has no reasonable expectation of privacy in an automobile belonging to another." *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) (citing *Rakas*, 439 U.S. at 148-49); *United States v. Anguiano*, 795 F.3d 873, 877-79 (8th Cir. 2015) (mere passenger lacked reasonable expectation of privacy in vehicle); *see also Russell*, 847 F.3d at 618 (citing cases).

It is undisputed that the red car belonged to Defendant's uncle. Defendant has presented no evidence suggesting he has a constitutionally protected connection to the car or its contents. *See United States v. Long*, 797 F.3d 558, 568 (8th Cir. 2015). In fact, Defendant has tried to distance himself from any association with the car. (*See* Def.'s Mem. in Supp. at 20.) Because Defendant has not established a reasonable expectation of privacy in the red car, he has no standing to challenge the search. *Russell*, 847 F.3d at

619; *Long*, 797 F.3d at 568.  Therefore, the Court recommends that Defendant's motion

to suppress the items recovered from the search of the car be denied.[10]

### III. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Defendant's Pretrial Motion to Suppress Search and Seizure (ECF No. 24) be **DENIED**.

2. Defendant's Pretrial Motion to Suppress Eyewitness Identifications (ECF No. 27) be **DENIED**.

3. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizures (ECF No. 35) be **DENIED**.


Date: April___12___, 2017                              *s/ Tony N. Leung*
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       for the District of Minnesota


                                                       *United States v. Perry*
                                                       Case No. 16-cr-287 (PAM/TNL)


### NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being

---

[10] Moreover, whether Defendant did or did not have enough time and opportunity to place the gun and magazines in the car may be an issue for the trier of fact.  For purposes of this motion, even if the Court were to analyze Defendant's substantive arguments on this point, the officers had sufficient probable cause from the description of the shooter, the short time and distance from when and where the shots were fired, Defendant's close proximity to the car, and the fact that Officer Korus could see the magazines and gun from outside the car.

served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.